641 So.2d 906 (1994)
Laura GRUMNEY, f/k/a Laura Ann Haber, Appellant,
v.
Lee HABER, Appellee.
No. 93-01825.
District Court of Appeal of Florida, Second District.
July 6, 1994.
Rehearing Denied August 30, 1994.
Stevan T. Northcutt of Levine, Hirsch, Segall & Northcutt, P.A., Tampa, for appellant.
Frank Lester Adams, III, Tampa, for appellee.
PATTERSON, Judge.
Laura Grumney (the mother) appeals from the trial court's order which transfers the primary residence of the parties' son to Lee Haber (the father). We hold that the trial court abused its discretion in changing the child's primary residence and reverse.
The parties divorced in September 1987. Pursuant to their agreement, the final judgment awarded them shared parental responsibility for Matthew, their nineteen-month-old son. The mother was granted primary residential care and the father was given liberal visitation.
In January 1991, the father petitioned the court to modify primary custody. He contended that Matthew's best interest would be served by the modification because of the mother's financial instability, her frequent changes in residence, and her series of relationships with men.
The record of the final hearing in February 1993 reveals the following facts. After the parties divorced, the mother attempted to start her own business, but was unsuccessful. As a result, she had financial difficulties which required her to change her residence and Matthew's day care on more than one occasion. Unable to make ends meet, she bounced numerous checks and failed to maintain insurance on her car. The mother also experienced several failed relationships; however, in 1990, she married Bruce Grumney. *907 The couple purchased a home, where they continued to reside at the time of the final hearing. In 1991, she had a second child, the result of a prior relationship.
The father also remarried. Both parties and their respective spouses were deeply involved with Matthew, and all enjoyed warm, loving relationships with him.
Matthew was described by his day care providers and his teachers as basically a normal little boy, although he had displayed some behavioral problems in school situations and was prone to stammer. None of his day care providers or teachers had suggested that he needed counseling or referred him for evaluation. Dr. Isaza, the child psychologist who saw Matthew regularly to deal with his anxiety over the custody litigation, testified that his behavior was normal for a boy his age.
Child psychiatrist Joseph Lupo testified that he had been engaged by the father to conduct a custody evaluation. Dr. Lupo's report, issued in May 1991, concluded that the father had a slight advantage as residential parent. At that time, he had seen Matthew only once and had not tested him or the mother. Dr. Lupo acknowledged that Matthew's psychological family was at the Grumney household. He stated that Matthew was experiencing some anxiety; however, he did not attribute anything about Matthew's behavior or emotional state to the mother. Rather, he testified that the custody litigation itself could have caused Matthew's anxiety. The doctor could not positively state that a change of primary residential care was necessary to Matthew's well being. In fact, Dr. Lupo said he would be on "thin ice" to recommend a residence change.
The trial court announced at the hearing its decision to transfer Matthew's primary residence to the father. When the mother's attorney asked the court for its reasons in finding a substantial change in circumstances, the court stated: "It's in the child's best interest that the child be placed with the father on a primary basis with frequent and liberal access to the mother." In its final order, the court found that "the best interests of the child are currently not being met by having the mother serve as primary residential custodian," and that although the mother was not an unfit parent, "the father is substantially more fit to serve as primary residential parent." The court felt that some of the child's problems were attributable to the mother's "personality traits."
A trial court's discretion to order a change in residential child custody is far more restricted than its discretion when making an initial custody determination. Jablon v. Jablon, 579 So.2d 902 (Fla. 2d DCA 1991). Zediker v. Zediker, 444 So.2d 1034 (Fla. 1st DCA 1984). The parent seeking the transfer bears the "extraordinary" burden to prove a change in circumstances so substantial that the child's continued presence in his current home will be detrimental to him, and that placing him with his other parent is in his best interests. Jablon, 579 So.2d at 903; Eddy v. Napier, 558 So.2d 199 (Fla. 2d DCA 1990); Ours v. Ours, 515 So.2d 281 (Fla. 1st DCA 1987).
Here, the evidence failed to support the trial court's determination that Matthew should be removed from his mother's home. There was no evidence that the mother was not meeting Matthew's needs. See Gutierrez v. Medina, 613 So.2d 528 (Fla. 3d DCA 1993) (custody change reversed where there was no evidence to support the master's finding that the custodial parent neglected the child's needs). The mother's financial and romantic instability following the divorce was not shown to have any effect on the child, and was not in itself a valid ground for changing custody. Ours, 515 So.2d at 282.
Dr. Lupo did not relate any of Matthew's behavior to the mother's conduct or "personality traits." Thus, the fact that Matthew had exhibited some behavioral problems was not a valid basis for ordering his residence transferred to his father. Shelley v. Shelley, 480 So.2d 166 (Fla. 1st DCA 1985), review denied, 491 So.2d 280 (Fla. 1986) (custody change reversed in absence of clear proof that custodial parent caused child's emotional problems).
In any event, none of the father's allegations of the mother's character flaws were more recent than the first half of 1991. By the time of the final hearing in February *908 1993, it had been two years since the mother's business had collapsed. The mother had been married to Bruce Grumney for two-and-one-half years and had not moved or changed Matthew's school in that time. The psychologists opined she was furnishing Matthew a home life that was stable and appropriate. There was no evidence that Matthew's continued presence in that environment would be detrimental to him, or that removing him from that home would serve his best interests. Therefore, we reverse the order modifying primary residential custody to the father.
Reversed.
PARKER, A.C.J., and BLUE, J., concur.